Brockenbbotjgh, J.
The questions to be decided, are, whether the court erred in refusing to give the instructions which were asked for, or in those which it did give ?
As to the first. The presentment of a bill of exchange for acceptance, should in all cases be made during the usual hours of business. It appears, in this case, that fruitless attempts were made by the clerk of the holder to find the drawee at his counting room, on Saturday the 24th March (the very day when the bill arrived in Liverpool) and on Monday the 26th; that, on the 27th, diligent search was made by the holder himself at the exchange, the brokers’ offices, and the newsroom, at which places the drawee did most of the little business which he transacted; and that, in consequence of these searches and inquiries, the drawee at length made his appearance at the house of the holder, the bill was presented to him, and he refused to accept. It does not certainly appear-, that it was on the 27th that the drawee went there: it may have been on the 28th," and it is only by inference that the time can be ascertained. But admit that it was on the 27th, yet, surely, if it was too late on that day for the holder to find the notary, and put the bill into his hands to enable him to make the presentment during the usual hours of *195 business on that day, it was useless then to put it into the hands of the notary, since it could not be presented till the next day. Here was a case in which something less than an inevitable accident would excuse the holder from putting the bill into the notary’s hands on that day. The court, therefore, did right in refusing to give the instruction asked for, and in modifying it in the manner it did.
As to the second instruction. It is true, that the presentment of a bill should be made to the drawee himself, or his authorized agent. But I cannot perceive any good reason why this instruction should have been given. The evidence shews, that the drawee was hard to be found, that after being found he promptly refused acceptance to the holder, and that afterwards when the notary went to the counting house of the drawee, he presented the bill to the clerk there found, and demanded acceptance thereof, and received for answer that the bill would not be accepted, he having received no orders to accept the same. Under the circumstances, the notary had a right to presume, that the clerk was authorized by his principal to refuse the acceptance, and the court was right in drawing the same conclusion.
The third instruction that was asked for, was, that the notarial presentment could not regularly be made by the notary’s clerk, but must bo made by the notary himself, in order to warrant the notary in making the protest. This general proposition was probably founded on a remark of Mr. Chilly, who says, “ the demand is the material thing, and must, it is said, in the case of a foreign bill, be made by a notary public himself, to whom credit is given because he is a public officer, and it cannot be made by his clerk.” A similar remark had been made by Gwyllim in his edition of Bacon’s Abridgment, vol. 4. p. 725. but in rather more positive terms : “ The demand of payment of a foreign bill, must be made by *196 the notary public himself, and not by his cleric.” But both of these writers' refer for the proposition, to a dictum of Butter, J. in Leftley v. Mills, 4 T. R. 175. Chitty had certainly some doubts of its soundness, for he introduced it with an it is said; and in the note, he adds sed, quere. When we look at the case referred to, we find it as follows. It was an action by an indorsee of an inland bill of exchange, against the acceptor. The bill was dated 4th April 1790, payable fourteen days after sight, and being accepted on the 7th, consequently became due, allowing the three days of grace, on the 24th, which fell on a Saturday. There was a plea of non assumpsit as to the whole except as to £ 20. 7. 6. and as to that a plea of tender. On the 24th, the plaintiff having left the bill at Lockhart's (his banker) at Pall Mall, one of Lockhart's clerks called at the defendant’s house with the bill, but the defendant not being at home, the clerk left word where the bill lay, that the defendant might send and take it up; which not being done before six o’clock, it was noted by another clerk of Lockhart, who was a notary. Between seven and eight o’clock in the evening, the same person who first went to the defendant’s called on him again with the bill, in the character of a notary’s clerk, when the defendant offered to pay the bill, but refused to pay half a crown more which was demanded for the notary. Several questions arose in the case; but the only one decided by a majority of the court, was, that the statute of Will. 3. respecting protests of inland bills, did not apply to such bills as were made payable after sight, and applied only to such as were payable after date. A difference of opinion existed between lord Kenyon and Buller, J. as to the question, whether the acceptor of an inland bill is bound to pay it on demand at any reasonable time of the third day of grace, or whether he is allowed the whole of that day to pay it in. These two questions have nothing to do with the *197 one now under consideration. But Butter, J. alone gives his view of what is necessary to be done in making a protest: after stating, that three things are necessary, the noting, demanding and. drawing up the protest, he said—“ The next and material part is the making of the demand”—“ It is material too, to consider by whom the demand was made in lids case. I am not satisfied that it was a proper demand, for it was only made by a banker’s clerk. The demand oí a foreign bill must be made by a notary public, to whom credit is given because he is a public officer.” This opinion is clearly an obiter opinion; for the judge immediately after says that there could not be any protest at all in the case, as none was required at common Jaw on inland bills, and the statute of William, does not apply to it. Admit, however, that it has great force, on' account of the eminent source from which it springs, yet what does it prove r The notary charged the acceptor with half a crown, the fee for noting the bill. If the demand of payment was made by a person properly authorized, and the acceptor refused payment to him, and the notary then noted the bill for protest, he was entitled to his fee: but if the demand was not made by a proper person, the note for protest was not properly made, and the notary had no right to his fee. But the judge was not satisfied that it was a proper demand, for it was only made by the banker's clerk. He does not say it was made Jjy tire notary's clerk, and therefore he does not say, that if it had. been made by such an one, the demand would have been a.n improper one. The noting, according to the statement, wa.s founded on the previous demand by the banker's clerk, which was not satisfactory to the judge. At the time he made the demand, he was not the clerk of the notary. It is true, that an hour or two after the noting was made, the same clerk called again with the bill in the character of notary's clerk, but this new character did not validate the de *198 mand which he had previously made in a different character. The judge goes on to say, that the demand of a foreign bill must be made by a notary public, to whom credit is given, because he is a public officer. This general observation must be taken with reference to the case before him, and clearly discountenances the demand made by a clerk who was not in the employment of the notary nor in any manner under his control: but it ought not I think to be extended further. And it seems to me, that much inconvenience would result, in commercial proceedings, from establishing the principle, that a presentment and demand made by a notary’s cleric, is not a sufficient foundation for a protest; and, on the other hand, that no injury can proceed from allowing it. In such a commercial emporium as Liverpool, a notary public of reputation must be frequently crowded with business : without the aid of his clerks, he must neglect much of it. It may be necessary to make demands in different parts of the city, at the same moment, whilst his own presence in his office is indispensable ; and most of this business must be done within certain hours of the day. If the simple business of making demands on bills, or even of receiving the money due on them, cannot be done by his clerks, it must frequently go undone, or the holders must resort to other notaries of inferiour reputation, or those less approved of. Then, I ask, where is the danger of confiding this business to his clerk ? He is under the control and direction of the notary, who is responsible for his acts, and his omissions of duty. The protest is to be drawn up by the notary himself, and the law may well confide in his discretion that he will not solemnly protest, unless he is entirely satisfied that the demand has been made as it ought to be made. The necessity of employing clerks of the notaries in this matter justifies the practice; and, accordingly, it is proved in this cause, that it is the usage in Liverpool for notaries to do this *199 kind of business by their clerks. I think, then, that the obiter dictum of judge Butter should not be allowed to make the law, particularly as he had not before him the very case of a demand by a notary's clerk, as the foundation of a protest by the notary. I cannot rely, as authority, on the mere adoption of this principle by Gwyttim, nor on the hesitancy of Chitty in adopting it, particularly as judge Bayley in his treatise on bills has not adopted it. In the fourth edition of that work revised by himself, that principle is no where laid down; and although in the notes he has twice referred to the case of Leftley v. Mitts, he has omitted the abovementioned dictum of judge Butter. Chitty, in a subsequent edition (Philadelphia edition of 1826, p. 417.) further remarks, that the doctrine which he had laid down so hesitatingly, was sanctioned in a late case, and he refers to the case of ex parte Wasley, 2 H. Blacks. 275. In this, I think, he is mistaken. The decision there, was merely that where the rule of court required that the affidavit of the acknowledgment of a warrant of attorney to suffer a recovery, shall be attested by a notary public, that rule should be strictly observed, and that the taking of the affidavit before an ordinary magistrate of Gibraltar, did not come within the rule, unless it was attested by a notary public.
I am of opinion, that the third instruction was properly refused by the circuit court. The judge seemed to admit the proposition to be true, but refused it, because the protest of a foreign bill of exchange, made in a foreign country, proves itself. This position is correct. 12 Mod. 345. Bayley 332. n. 44. But the judge went further and said, that the protest now produced appearing on its face to be in all respects regular, parol evidence was not admissible to prove that the protest was not made in the manner stated therein. This is laid down too broadly, for it seems sufficiently clear that the notarial, protest is only prima facie not conclusive evi *200 dence, that the bill was not accepted, or not paid, and therefore may be contradicted by other evidence. 4 Gwyl. Bac. Abr. 725. But I do not think, that this erroneous reason given by the judge, is a sufficient ground for reversing the judgment. He did not mean to say, that evidence might not be admitted to prove that the presentment and demand were not made at all; if hé had intended to say so, he would have given an opinion on a mere abstract proposition, for no such case was made by the evidence before him: he merely meant to say, that as the protest stated that the notary himself had made the demand, evidence was not admissible to prove that the cleric of the notary had made it. Taking it in this restricted sense, the opinion is not so objectionable as has been supposed: for on the concession that the demand may be made by the notary’s clerk, as the foundation for the notary’s protest, it is useless to introduce evidence to contradict the protest in this respect; because, quacunque via data, the protest is unexceptionable. I therefore repeat, that this reason given by the court is no ground for setting aside the judgment.
The fourth instruction asked for involves a question of the lex loci contractus. It was admitted at the trial, that the bill of exchange was drawn at Petersburg for the accommodation of the drawers residing there; that Dunlop 8f Orgain indorsed it, also for the accommodation of the" drawers; and that the Farmers Bank of Petersburg, whose cashier also indorsed it, undertook to dispose and did dispose of it, in New York, for and on account of the drawers, who made it with the intention of having it negotiated in that manner. The plaintiff appears to have been the purchaser. The bill came back protested from Liverpool; and in ascertaining the extent of the recovery to which the holder is entitled from the drawers, the question is, whether the law of New York, or that of Virginia, is to prevail ?
*201 The general rule is, that where persons enter into a ° . personal contract m a foreign state or country, and a litigation grows out of It, the law of the place where the contract was made, gives the rule of decision. There is, however, an exception to this general rule; which is, that where the transaction is entered into with a view to the laws of another country, then the law of the place of contract will not govern. The rule, and the exception, a,re laid down by lord Mansfield in Robinson v. Bland, 2 Burr. 1078. There, the first count in the declaration was on a bill of exchange drawn at Paris by sir John Bland, on himself in England, for the sum of ¿£672. sterling, payable to the order of Robinson the plaintiff! ten days after sight, value received, and accepted by sir John Bland. The bill was given for ¿£300. lent a.t Paris by the plaintiff to Bland, at the time and place of play, and for ¿£372. more, lost at the same time and place, by Bland to the plaintiff', at play. The judge, after laving down the rule and exception, said—“Now, here, the payment is to be in England; it is an english security, and so intended by the parties.” Huberus is quoted by lord Mansfield, and in the passage referred to, that author, after laying down the general rule, says—“Nevertheless, the place in which the contract is entered into is not so entirely to be respected, as that if the parties, in contracting, look to another place, that place is not the rather to be considered. For every one is understood to have contracted in that place in which he bound himself that he would pay.” In the case of Warders v. Arell, 2 Wash. 282. the authority of Robinson v. Bland and of Huberus was approved and relied on. There have been several interesting decisions in the supreme court of the U. States that bear on this question. The rule and the exception seem to be clear enough, and yet the application of them to the case under consideration is sometimes attended with difficulty. See Slacum v. Pomeroy, 6 *202 Cranch 221. Lanusse v. Barker, 3 Wheat. 101. 146. Boyce & Henry v. Edwards, 4 Peters 123.
How was it in the case before us ? Although the bill was drawn in Virginia, yet it was sold in Neiu York. There was no contract in Virginia, between the drawer on the one hand, and Fotterall on the other. It was no contract till the bargain was made for the sale of the bill; and that was made in New York. The contract was not even begun at Petersburg; it begun and ended at New York. That being the place of contract, the law of that place must govern, unless the parties, when the sale was effected, had reference to Virginia as the place in which the defendant would repay the money, in case the bill should come back protested. I incline to the opinion that they had no such reference. The money was advanced -in New York, and according to Lanusse v. Barker, it was to be replaced there.
But if I am wrong in this particular; if the parties, though contracting in New York, had reference to Virginia as the place for the payment, by the drawer, of the contents of the bill and its incidents accruing upon the dishonour of it; I am yet confident, that the circuit court did not err in its construction of our statute directing that the current money paid or allowed on foreign bills shall be expressed on the face of them. The statute contemplates bills purchased in this state. The 4th section speaks, first, of bills given for a, debt due in current money of Virginia: a debt due in current money of Virginia is a debt contracted in Virginia; and if the bill be given for such debt, it is still a Virginia transaction-. So, if the current money of Virginia be advanced and paid for such bill, the bill is purchased and paid for in Virginia. A man advancing or paying money at Philadelphia or New York, for any article sold there, although it comes from Virginia, does not pay in Virginia currency, but in Pennsylvania or New York currency. In this case, although the bill was drawn *203 and indorsed in Virginia, it was not drawn and indorsed for any money advanced or paid here, because it was drawn and indorsed expressly for the pm pose of being negotiated in New York. It was made to be sold there, and was sold there: there was no contract till it was sold there: it was, as to Fotterall, a mere blank piece of paper till he purchased it, and when he purchased it, he paid for it in the current money of the place where the transaction occurred. Although the bill ex;presses on its face that it is for current money here advanced (if that meant Petersburg) it was not necessarily true; and the sale of the bill in New York shews that in fact it was not true. The purchaser cannot be estopped from shewing that that averment was not agreeable to the fact. It was of no importance to the validity of the bill, whether it expressed the consideration to be for Virginia currency paid, or not; all that was important was, that the bill should express “value received,” as the consideration. But the last clause of the section shews, clearly, that it extends only to bills purchased and sold in Virginia. It inflicts a penalty on the purchaser. It is to be remarked, 1. that the law supposes that the drawer can have no inducement to insert an untrue sum in the bill, but that the purchaser may express a false consideration, or cause it to be expressed : it supposes, then, that the purchaser is to be present by himself or his agent when the bill is drawn; present at its concoction; the actor in the insertion of a false consideration on the face of the bill. It does not apply to the case of a drawer being himself the criminal actor, inserting a false consideration, and sending out the bill ready drawn and indorsed, to another state to be sold for what it is really worth. It does not apply to a purchaser of such bill in another state, who takes the bill as he finds it prepared, and pays for it in his own currency. 2. The imposition of a penalty shews that the law contemplates the purchase to be in *204 Virginia. Our courts can take no cognizance of an of-fence committed in another state. The legislature would not do so vain a thing as to inflict a penalty on the making of a contract in another state, which if done here is unlawful, and'might well be punished, but may not be unlawful in the state where it is done, and if unlawful can only be punished by their own tribunals. If this law be applicable to the present case, then the innocent purchaser might be punished, and the guilty drawer rewarded.
I have not turned much of my attention to the pleadings in this case. The counsel for the appellant began with an attack on the declaration, but in the progress of the discussion he seemed to abandon his objections to it, and relied on the alleged errors in the instructions of the court, as the ground for reversal of the judgment. The declaration does not charge a protest for non-acceptance or non-payment of the bill'. But this is no ground for arresting the judgment. At the most, the omission could only be taken advantage of by a special demurrerBayley 285. n. 236. But even if it would be bad on general demurrer, the judgment could not be arrested under the broad words of our statute of jeofails, which, after verdict, cures every defect, “ whether of form or substance, which might have been taken advantage of by a demurrer, and which shall not have been so taken advantage of.”
It has been suggested, that the verdict and judgment are erroneous in giving damages for the protest, the declaration not having set forth a protest. If the defendant had thought proper to make this objection, and to move the court to direct the jury not to give such damages, because there was no allegation of a protest, I will not say that such direction should not have been given ; but as the defendant waived the objection, or did not make it at the proper time, and before the proper tribunal, I do not think the appellate court ought to help him.
*205 It is further suggested, that there is no allegation in the declaration that the bill, though drawn and indorsed at Petersburg, was negotiated in the city of New York. I do not know that this was at all necessary, but if it was, it would have been enough to have alleged it under a scilicet: that the bill after being made and indorsed in Petersburg, was sold and transferred to the plaintiff at the city of New York, to wit, at Petersburg aforesaid. The want of such allegation is surely cured by the statute of jeofails. Again, at the trial the defendant did not object to the evidence proving that the contract was made at New York; he therefore waived all objection to the want of this allegation, and it cannot now be brought forward to operate in his favour.
I am of opinion, that there is no error whatever in the judgment, and that it should be affirmed.